# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GARY CAUDILL, ET AL.,

       Plaintiffs,

v.                                  Case No. 06-12866

SEARS TRANSITION PAY PLAN, ET       Honorable Arthur J. Tarnow
AL.,

       Defendants.

_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [71], GRANTING DEFENDANTS' MOTION TO STRIKE [335], GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT UNDER RULE 56 [331], AND DENYING DEFENDANTS' EMERGENCY MOTION TO BIFURCATE [230], MOTION TO DISMISS [330], MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [333], AND MOTION TO STRIKE REPORTS [351]

This case involves a class action brought against Defendants for improperly

denying severance benefits to Heating, Ventilating, and Air Conditioning (HVAC)

sales associates. Class members are all full-time HVAC sales associates (1) who

had a minimum of one year of service with Defendant Sears, Roebuck, and Co., at

the time of the transition to Defendant Sears Home Improvement Products (SHIP)

and (2) who applied for severance benefits under the Transition Pay Plan (TPP).

The class issues litigated are: (1) Whether, under 29 U.S.C. §1132(a)(1)(B),

Defendants wrongfully denied benefits to the class in a manner that was

procedurally defective 2) Whether benefits are due to the class under the terms of

the Transition Pay Plan.

Plaintiffs allege that beginning in late 2004, they and their co-workers were transitioned from their sales jobs in the HVAC department of Sears to a new department, SHIP. Under the Transition Pay Plan, participants could either accept transition into the new SHIP entity or receive severance benefits if they were eligible.

HVAC sales associates were eligible for benefits unless they were "offered a comparable job," which was defined as one "utilizing current skills" that 1) does not involve a decrease in annual earnings potential of more than 10% and 2) is within a reasonable commuting distance (approximately 30 miles if the commute is daily or the equivalent if less frequent than daily— e.g., 150 miles if the commute is weekly or 300 miles if the commute is every two weeks) of the associate's home. *See* Plaintiffs' Motion for Summary Judgment, Exhibit C at Sears 00042. For a job to be considered comparable, it had to satisfy all three provisions. If one provision was not met, the new job was not comparable and the associate would be entitled to severance benefits. The business only had to "offer" a comparable job to avoid paying severance benefits; thus, if an associate declined to take the new position, then he or she would not receive benefits.

Plaintiffs argue that the transition into SHIP did not place them in a "comparable job" and that they were accordingly entitled to severance benefits

under the TPP.  Defendants denied benefits to every HVAC sales associate, except one, Roy Queen, asserting that the new position at SHIP satisfied the above three provisions.

Now before the Court are Plaintiffs' Motion for Summary Judgment [71] and Defendants' Emergency Motion to Bifurcate [230], Motion to Dismiss [330], Motion for Summary Judgment under Rule 56 [331], Motion for Judgment on the Administrative Record [333][1], and Motion to Strike Reports [351].  A hearing was held on the motions on April 27, 2010.

For the reasons that follow, this Court finds that Defendants denied benefits to the class in a manner that was procedurally defective.  Defendants are ordered to provide benefits to the class under the terms of the Transition Pay Plan.

## I. Defendants' Emergency Motion to Bifurcate [230]

As indicated at the hearing, this motion is essentially moot since it requested that the Court clarify issues to be addressed in the dispositive motions.  Those dispositive motions have been filed and are now before the Court.  Furthermore, the issues Defendants seek to have clarified regarding how this case will procedurally move forward were previously addressed.

Accordingly, the motion is DENIED.

## II. Defendants' Motion to Dismiss, or in the alternative, to remand the claims of class members Bruno Vecchiarelli, Gil Yaras, Daryl Geiger, and Edwin

---

[1] Defendants also filed a Motion to Strike [335] Administrative Record 261 because it inadvertently included redacted information.  A redacted version was filed as Docket No. 325. Plaintiffs did not file a response in opposition to this motion.  Accordingly, it is granted.

**Goldberg to the Plan Administrator [330]**

Plaintiffs previously filed a motion [195] seeking to add the above individuals to the class, which this Court granted after holding a hearing on August 19, 2009. Defendants' current motion seeks to re-litigate that issue with arguments that were previously rejected[2]. If Defendants disagreed with the Court's ruling, they could have filed a motion for reconsideration following the hearing.

Accordingly, the motion is DENIED.

## III. Defendants' Motion for Summary Judgment under Rule 56 [331]

Both parties agree that class members Cherepinsky and Leary signed agreements in other lawsuits releasing all claims against Defendants. Accordingly, Defendants' Motion, as to the dismissal of Cherepinsky and Leary, is GRANTED.

As to the remaining class members addressed in the motion— Defendants argue that they failed to exhaust their administrative remedies before filing suit and that they therefore should be dismissed from this action.

The Sixth Circuit has concluded that "[t]he application of the administrative exhaustion requirement in an ERISA case is committed to the sound discretion of the district court...." *See Fallick v. Nationwide Mutual Insurance Co., et al.*, 162 F.3d 410, 418 (6th Cir. 1998). However, "Although ERISA's administrative exhaustion requirement for claims brought under §502 is applied as a matter of judicial discretion, a court is obliged to exercise its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would

---

[2] The motion also raises questions about the number of class members. At the hearing on April 27, 2010, both parties agreed that the number of class members was 89.

simply be futile or the remedy inadequate." *Id.* at 419. In order to demonstrate futility, "[a] plaintiff must show that it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision." *Id.* at 419 (citation and internal quotation marks omitted).

In *Fallick*, the Sixth Circuit reversed the district court's finding that Plaintiff was required to exhaust administrative remedies, concluding that Defendant had "never demonstrated that it would alter or even consider altering its underlying methodology [for determining reasonable and customary limitation], notwithstanding [Plaintiff's] ERISA claims, both individually and on behalf of all similarly situated." *Id.* at 419-420. The Court further noted that:

> [c]lear and positive evidence of the futility of exhausting the Plan's administrative remedies may also be found by looking to the purposes of the exhaustion of remedies doctrine, as enumerated by [prior case law]. In this case, requiring [Plaintiff] to exhaust [Defendant's] formal administrative process would in fact be contrary to the policies served by exhaustion. The law does not require parties to engage in meaningless acts or to needlessly squander resources as a prerequisite to commencing litigation. First, [Plaintiff's] lawsuit is not frivolous, nor is it likely, after two years of inquiries and perpetual stalemate, that a forced return to the administrative process would make these proceedings less adversarial. Second, were [Plaintiff] to exhaust his remedies, both he, the class he seeks to represent, and [Defendant] would all incur additional litigation costs. Third, the factual record is already very well established here. Finally, while [Defendant] might make further symbolic, token concessions by correcting individual accounting errors that should not have been made in the first instance, this Court is certain that [Defendant] will not seriously reconsider its methodology. Every such adjustment is but a pyrrhic victory for [Plaintiff] and the proposed class. Consequently, exhaustion of administrative remedies in the instant matter would be futile.

*Id.* at 420-421 (citations and internal quotation marks omitted).

Similarly, Plaintiffs here have demonstrated the futility of exhaustion. Plaintiffs' lawsuit is certainly not frivolous; as will be discussed below, their claims have merit. All parties would incur additional litigation costs if Plaintiffs were required to go back and make use of the administrative process. The factual record has been greatly developed over the last four years of this litigation. Furthermore, this Court is certain that Defendants will not seriously reconsider their methodology for computing benefits, which Plaintiffs have maintained (and established, as to be addressed below) makes use of a rigged formula under which Plaintiffs could never receive benefits and thus would be denied benefits if they even sought them.

Under these circumstances, it would have been futile for the class members named in the motion for summary judgment to exhaust. Accordingly, Defendants' motion as to these class members is DENIED.

## IV. Defendants' Motion to Strike [351]

Defendants move to strike the reports and testimony of Plaintiffs' two experts, Dr. Johnson and Dr. Paranjpe. Defendants previously moved to strike these reports and their motions were denied following the hearing held on April 29, 2009. Defendants now move again to strike the reports, raising some of the same arguments from the prior motions along with some new ones.

### A. Dr. Johnson

Defendants assert that Dr. Johnson's limited experience in the area of severance plans and his lack of knowledge regarding ERISA render him

unqualified as an expert in this case. However, Dr. Johnson's report makes clear that at his prior position at American Airlines[3], he acted as a fiduciary in plan interpretation and ruling on ERISA appeals. Although Defendants may disagree with some of Johnson's conclusions regarding ERISA, that is not grounds for striking the report.

Additionally, Dr. Johnson's incorporation of Dr. Paranjpe's report is not grounds for striking the report. Although Defendants claim that Dr. Johnson testified that he did not fully understand the report, he actually testified that he did not understand it "with the degree of detail that [Dr. Paranjpe] would understand it." *See* Defendant's Motion for Judgment on the Administrative Record (AR), Exhibit 18 at 154. More importantly, Dr. Johnson's conclusions are not solely based on the report of Dr. Paranjpe. Dr. Paranjpe offered a mathematical analysis of the earnings potential formula used, while Dr. Johnson's report is concerned with whether Defendants breached their fiduciary responsibility under ERISA.

Furthermore, Defendants' contentions that Dr. Johnson lacks knowledge about the Transition Pay Plan (TPP) and that Marcia Dalton, the plan administrator[4], failed to carry out her fiduciary duties may be grounds for

---

[3] Dr. Johnson served as Managing Director of Benefits Compliance and Pensions at American Airlines. *See* Defendants' Motion to Strike, Exhibit 4 at 2. He had operational responsibility for seven pension and 401(k) plans with over 100,000 participants and was involved in administering the management severance program. *Id.*, Exhibit 4 at 2. In October 2001, he retired from American Airlines and founded ERISA Benefits Consulting, Inc. *Id.*, Exhibit 4 at 4.

[4] As Dr. Johnson noted and the Transition Pay Plan states, Sears is the plan administrator; Marcia Dalton "acted on behalf of the plan administrator in performing the plan administration function." *See* Defendants' Motion for Judgment on the AR, Exhibit 9 at 14; *see also* Defendants' Motion to Strike, Exhibit 4 at 6.

disagreeing with the conclusions reached in the report, but are not grounds for striking the report completely.

Finally, Defendants' claim that the report does nothing more than impermissibly state legal conclusions is incorrect. The report examines the facts of the case, applies the requirements of ERISA, and explains how these requirements were not satisfied in specific ways.

Accordingly, the motion is DENIED as to Dr. Johnson.

**B. Dr. Paranjpe**

Defendants argue that Dr. Paranjpe[5] is not qualified to offer an opinion relating to the operation of an ERISA benefit plan and the plan administrator's interpretation of the plan. However, Dr. Paranjpe was not testifying, and is not offering a report, as an expert in ERISA plans. Thus, his knowledge regarding ERISA is not particularly relevant here.

Defendants argue that Dr. Paranjpe never validated the data he tested. However, he testified that he worked with the data (which had been provided by Defendants to Plaintiffs) as it was presented it to him. Therefore, he did not see any need to validate it.

Defendants further assert that Dr. Paranjpe never looked at actual hours worked by HVAC sales associates, which, according to Defendants, he used to come to his conclusion that the formula used by Defendants would only result in

---

[5] Dr. Paranjpe, who holds a Ph.D. in economics, is a partner in Thomson Econometrics and Employment Research, a firm that provides economic and statistical research services to its clients. *See* Defendants' Motion to Strike, Exhibit 1 at 1. He is an instructor in the Department of Community Medicine and School of Business Administration at Wayne State University and also teaches in the Economics Department and Decision and Information Sciences Department at Oakland University. *Id.*, Exhibit 1 at 1-2.

benefits being provided if the Sears associate worked less than 1321 hours in 2004. This argument was raised in Defendants' prior motion to strike and that motion was denied after hearing on April 29, 2009. There is no reason for the Court to reverse its prior ruling. Dr. Paranjpe did not use the hours worked in 2004 to come to his conclusion. Rather, he analyzed the Defendants' formula for determining the gap between the 2004 earnings and the 2005 potential earnings. That analysis led him to conclude that it was mathematically impossible to get benefits, as long as an employee worked more than 1321 hours. Defendants previously admitted that their formula assumed that 2004 employees worked 40 hours per week. *See* Defendants' Motion to Strike Exhibits Not Part of the Administrative Record [99] at 11. Thus, there is no basis for striking the report on these grounds.

Defendants also assert that Dr. Paranjpe's report and testimony do not assist the trier of fact because one HVAC associate, Roy Queen, received benefits.[6] However, Dr. Paranjpe's report is clearly relevant and does assist this court regardless of whether Queen received benefits. Moreover, Dr. Paranjpe testified that he viewed Queens' data and found that Defendants did not give a 1% commission increase to him, which explained why he would qualify for benefits.[7] *See* Defendants' Motion to Strike, Exhibit 2 at 55.

---

[6] Although Roy Queen was the only HVAC sales associate to be awarded benefits, HVAC district sales managers received TPP benefits because they were moving from salaried positions (pre-transition) to commissioned positions (post-transition) and were for the first time expected to conduct in home sales.

[7] As part of the earnings methodology Defendants used to compare earnings between 2004 and 2005, Defendants assumed a 1% increase in commission in 2005 for HVAC associates when they transferred to SHIP. *See* Defendants' Motion for Judgment on the AR, Exhibit 3 at 186.

Finally, Defendants claim that the report is unfairly prejudicial. Although the report may be harmful to Defendants' arguments, it is in no way unfairly prejudicial for this Court to consider the report.

Accordingly, the motion is DENIED as to Dr. Paranjpe.

## V. Defendants' Motion for Judgment on the Administrative Record [333] and Plaintiffs' Motion for Summary Judgment [71]

The instant action, filed on June 28, 2006, is a complaint for wrongful denial of benefits under ERISA. Following a hearing on April 29, 2009, Plaintiff's Motion for Class Certification [52] and Motion for Consideration of Evidence Submitted in Support of Judgment for Plaintiffs' [143] were granted. As stated in the Court's order [186], Plaintiffs assert a procedural challenge to the administrator's decision, under the exception to the general rule limiting this court's review to the administrative record. Plaintiffs accordingly offer evidence outside of the administrative record to support the claim that Defendants wrongfully denied benefits in a procedurally inadequate way.

Plaintiffs dispute Defendants' decision to deny benefits to class members and have alleged procedural challenges that fit within the type of challenges discussed in *Moore v. Lafayette Life Insurance. Co.,* 458 F.3d 416 (6th Cir. 2006), and *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998). In identifying possible procedural defects, the Court in *Moore* gives examples of problems with due process, such as lack of notice, inadequate explanation for a denial of benefits, and not giving an opportunity for a participant who had been denied a claim to receive a full and fair review of the denial. *See Moore*, 458 F.3d at 436. In short, *Moore* conceives of the *Wilkins* exception as covering challenges

in which "the procedural process of gathering all pertinent information may have broken down at the administrative level...." *Id*. at 430. The Sixth Circuit in *Wilkins* also states that "lack of due process" or "alleged bias" on the part of the plan administrator would constitute a procedural challenge. *See Wilkins*, 150 F.3d at 619.

Plaintiffs allege various procedural challenges in their Motion for Summary Judgment [71] and Supplemental Brief [233], including lack of notice and inadequate explanation for a denial of benefits. Plaintiffs allege they were wrongfully denied benefits, as they were not told in their denial letters that Sears had adopted a blanket policy of denial before any class member had even made a claim. Plaintiffs are also alleging bias on the part of the plan administrator and that Defendants failed to afford a reasonable opportunity for a full and fair review of their claims for benefits.

## A. Standard of review

The first question that must be addressed is what standard of review should apply in this case.

Both parties agree that "[i]f a plan endows administrators with discretionary authority to interpret the plan's terms or determine participant eligibility, a court should subject administrators' interpretations to a deferential standard of review." *See Bagsby v. Central States, SE & SW Areas Pension Fund*, 162 F.3d 424, 428 (6th Cir. 1998); *see also Firestone Tire & Rubber Co., et al. v. Bruch, et al.*, 489 U.S. 101, 115 (1989). This deference requires the court to determine whether the administrator's decisions were "arbitrary and capricious." *See Bagsby*, 162 F.3d at 428. Both parties agree the plan administrator here was given discretionary

authority to interpret the Plan and thus the arbitrary and capricious standard would apply under typical circumstances.

However, Plaintiffs argue that based on the flagrant violations of the procedural requirements of ERISA, this Court should conduct a *de novo* review. Plaintiffs cite to a 9th Circuit case, *Abatie v. Alta Health Life Ins. Co.,* 458 F.3d 955 (9th Cir. 2006) in support of their argument.  In *Abatie*, the 9th Circuit, in discussing the standard of review to apply when the plan administrator fails to follow procedural requirements, concluded that:

> When an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, we review de novo the administrator's decision to deny benefits.  We do so because, under *Firestone*, a plan administrator's decision is entitled to deference only when the administrator exercises discretion that the plan grants as a matter of contract.  *Firestone* directs, consistent with trust law principles, that a deferential standard of review [is] appropriate when a trustee *exercises* discretionary powers.

*See Abatie* at 971 (citations and internal quotation marks omitted).  The Court went on to state that "when a plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is granted."  *Id*. at 972. Ultimately, the Court found that *de novo* review did not apply because the case involved "the more ordinary situation in which a plan administrator has exercised discretion but, in doing so, has made procedural errors."  *Id*. at 972.      Thus, the Court concluded that if there were a finding that there were procedural violations

and the plan administrator did not exercise its discretion, then the plan administrator's actions could be reviewed *de novo*.

Plaintiffs do not cite to any 6th Circuit case law adopting *Abatie*. Plaintiffs also claim that the Supreme Court adopted *Abatie* but that is incorrect.[8]

Defendants argue that *Abatie* does not apply here. Moreover, they assert that the Sixth Circuit never adopted the holding of *Abatie*. Defendants fail to address what standard would apply if there was in fact a valid procedural challenge asserted here.

Neither party has pointed to a case exactly on point addressing what standard of review to apply to the type of procedural violations alleged here. *Abatie* has never been adopted in this circuit. In one Sixth Circuit case, *Shelby County Health Care Corp. v. Majestic*, 581 F.3d 355 (6th Cir. 2009), the Court applied the *de novo* standard in reviewing the wrongful denial of benefits.

---

[8] Plaintiffs point to the fact that the Supreme Court remanded a 9th Circuit case, *Hawkins-Dean v. Metropolitan Life Ins. Co.*, 161 Fed. Appx. 684 (9th Cir. 2006) in light of *Abatie*. *See Metropolitan Life Ins. Co. v. Hawkins-Dean*, 549 U.S. 1048 (2006). Upon remand, the Court addressed the holding of *Abatie* that the Court should not ignore inherent structural conflicts of interest, such as when an insurer both administers and funds an ERISA plan. *See Hawkins-Dean v. Metropolitan Life Ins. Co.*, 514 F.Supp. 1197, 1199 (C.D. Cal 2007). The *Hawkins-Dean* court found upon remand that in reviewing the denial of benefits, it would take into account conflict of interest because Defendant had "an incentive to pay Plaintiff as little in benefits as possible to maximize its profits." *Id*. at 1199. Thus, *Hawkins-Dean* did not state that *de novo* review should be applied to reviewing all procedural violations.

Moreover, the issue of conflict of interest was ultimately addressed by the Supreme Court in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008), where the Court found that arbitrary and capricious is the proper standard to apply in a case where conflict of interest is alleged, but conflict of interest is a factor to take into account in reviewing a plan administrator's decision regarding benefits under the arbitrary and capricious standard.

*Shelby* did not address an exact situation like the one here where the procedural challenge was to a predetermined blanket policy of denial but it nonetheless is informative.[9] The Court's conclusion in *Shelby,* consistent with *Abatie*, was based on the fact that although the plan administrator was delegated discretionary authority to interpret the Plan, the administrator failed to *exercise* that discretion because it let someone else make the benefits determination. Therefore, *de novo* review was appropriate.

Plaintiffs assert that Dalton, the plan administrator, did not exercise her fiduciary authority in that she improperly allowed Teige McShane, Director of Human Resources, to develop a "formula" for analyzing earnings, which was used to deny benefits. In Plaintiffs' view, SHIP essentially made the benefits determination, not the plan administrator.[10] Plaintiffs maintain that the TPP does not contain authority to delegate plan administration beyond the plan administrator. Plaintiffs rely on the report of their expert, Dr. Johnson, in support of their claims.

---

[9] In *Shelby*, the claim for benefits was investigated not by the plan administrator but by another entity without any involvement by the plan administrator. Letters sent to the plan administrator by the entity told the plan administrator that they denied the claims. Thus, the plan administrator did not make the ultimate determination of benefits.

[10] In support of this, Plaintiffs cite to an email Dalton sent to McShane in December 2004, where she asked him, "So would you agree that it would be appropriate for me to say that his [the claimant's] eligibility for TPP benefits has not yet been *determined by the business*..." *See* Plaintiffs' Supplemental Brief [233], Exhibit B, Kyte 00005 (emphasis added). Plaintiffs also cite to another email Dalton wrote to JoAnn Wrobel (SHIP Corporate Human Resources Manager- McShane is her boss) and McShane, where she inquires about how many times HVAC associate Walt Magness will be required to commute and concludes the email with, "Let me know which *you* decide." *Id.*, Exhibit H, Magness 00079 (emphasis added).

Defendants assert that McShane is not a fiduciary with regards to the Plan. Rather, he simply performed ministerial duties. Defendants point to their expert, Karen Suhre, who argues that McShane was not a fiduciary.[11] Defendants do not deny that McShane assisted Dalton but they argue that he would only give her information and she would make the final determination as to whether benefits would be awarded.

The parties and their competing experts thus dispute McShane's status as a fiduciary.

The Court finds that unlike the plan administrator in *Shelby*, Dalton appeared in some instances to retain final review authority over the decision to deny claims[12], regardless of whether McShane was very involved in the decision to

---

[11] Defendants obtained their own expert, Karen Suhre, to challenge Dr. Johnson's conclusions. Suhre asserts that under ERISA, individuals without the power to make plan policies or interpretations but who perform purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits are not fiduciaries. *See* 29 C.F.R. §2509.75-8. In her opinion, there is ample evidence to indicate that McShane and his staff were not performing fiduciary functions, but rather were performing ministerial functions. Although McShane and his staff would gather facts and information, Dalton had sole authority to interpret the Plan.

Suhre also maintained that Dalton and McShane were not operating under a conflict of interest. She notes McShane's testimony that he would not benefit personally from the decision of whether to grant benefits. Dalton also testified that the Finance Department at Sears was not involved in the decision process.

[12] For example, regarding Roy Queen, the one HVAC associate to get benefits- Emails indicate that McShane considered Queen an "anomaly" in that he qualified for benefits based on his earnings differential. Using a different methodology for computing the earnings differential was then apparently considered. In his email to Dalton, McShane states, "Marcia, *you can decide* how you believe appropriate...." *See* Plaintiffs' Motion for Summary Judgment, Exhibit N at Queen 0019 (emphasis added). Dalton responded that she did not think it was a good idea

establish the earnings formula and set up a blanket policy of denial.  However,

Defendants are mistaken in their assertion that what McShane was often doing was

purely ministerial.  The interpretations of the "earnings potential" provision were

frequently initially not made by Dalton, but were made by McShane, who did not

have a degree in mathematics or statistics, and others, although it was ultimately

reviewed with Dalton, who also lacked a degree in mathematics or statistics.[13]

McShane was not just feeding numbers to Dalton as to whether someone's income

would decrease more than 10%; he was actually interpreting the provision and

concluding what factors would be included in the earnings analysis (even though

he was not the plan administrator and was not, under the terms of the TPP, given

authority to determine eligibility for benefits).[14]  For example, McShane testified

that Dalton did not direct him to look at 2004 commissions and paid time off

(PTO) as part of the earnings analysis but rather that was something he determined

_____

to use a different formula then the one applied to everyone else.  *See* Plaintiffs' Motion for
Summary Judgment, Exhibit Q at 7.  Dalton ultimately contacted Sears counsel, who advised her
that it would be appropriate to  stick with the methodology they had been using.  *Id.* at 12.
Queen was subsequently awarded benefits.

[13] McShane testified that he has an undergraduate degree in psychology and graduate
degree in industrial organizational psychology.  *See* Defendant's Motion for Judgment on the
AR, Exhibit 3 at 47.  Dalton testified that she has an undergraduate degree in business
administration and no graduate degree.  *Id.*, Exhibit 9 at 9.  She also indicated that she lacks any
kind of "math modeling type experience or training."  *Id.*, Exhibit 9 at 9.

[14] Thus, McShane's role differs from that of the defendant (Northern) in the case Sears
relies on in asserting that McShane is not a fiduciary, *Baxter, et al., v. C.A. Muer Corp., et al.,*
941 F.2d 451 (6th Cir. 1991).  While Northern was "merely a claims processor," McShane's role
here was much greater than that.

himself would be appropriate. *See* Defendant's Motion for Judgment on the AR, Exhibit 3 at 138. He, not Dalton, made the initial determination that the methodology used would assume that 2004 and 2005 earned commissions would be the same. *Id.*, Exhibit 3 at 155. Dalton testified that she had no math modeling experience; therefore, it is unclear how she could knowledgeably approve McShane's decisions regarding the methodology used to compute eligibility for benefits.

Ultimately, it is unnecessary for this Court to conclude that McShane acted as a fiduciary (and that Dalton failed to exercise any of her discretionary authority) and that a less deferential standard of review therefore applies. That is because this Court finds that the denial of benefits here could not even be upheld under the arbitrary and capricious standard.

Plaintiff further argues that even if the arbitrary and capricious standard applies, the court should take conflict of interest into account. The Supreme Court has concluded that "arbitrary and capricious" is still the standard to use in reviewing the plan administrator's benefits decision even if conflict of interest exists. However, "When the same entity determines eligibility for benefits and also pays those benefits out of its own pockets, an inherent conflict of interest arises. In close cases, courts must consider that conflict as one factor..." in deciding whether the plan administrator acted improperly (arbitrarily and

capriciously). *See Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009)

(citing *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. at 2345). In certain cases, it

may be weighed more heavily. Conflict of interest will:

> prove more important (perhaps of great importance) where
> circumstances suggest a higher likelihood that it affected the benefits
> decision, including, but not limited to, cases where an insurance
> company administrator has a history of biased claims administration.
> It should prove less important (perhaps to the vanishing point) where
> the administrator has taken active steps to reduce potential bias and to
> promote accuracy, for example, by walling off claims administrators
> from those interested in firm finances, or by imposing management
> checks that penalize inaccurate decisionmaking irrespective of whom
> the inaccuracy benefits.

*Id.* at 2351.

Plaintiffs assert that Dalton failed to advise McShane, the person who was

also responsible for determining the cost impact[15] of the payment of TPP benefits,

that he was being delegated fiduciary authority and what that meant.[16] Dalton

failed to determine whether McShane was operating under a conflict of interest

before "delegating substantial fiduciary authority" to him and allowing him to

make a determination over whether benefits would be paid.

Defendants maintain that McShane's decisions were not influenced by the

---

[15] Plaintiffs cite to a document that lists one of McShane's responsibilities as identifying the cost impact of paying out the TPP. *See* Plaintiffs' Motion for Summary Judgment, Exhibit K.

[16] According to Plaintiffs' expert, Dr. Johnson, McShane, in interpreting the Plan, acted as a fiduciary, creating a conflict of interest.

Sears Finance Department, which was separate from the Sears Benefits Department. Dalton also did not serve to gain personally from denying benefits. She testified that her compensation was not affected by how many people were awarded benefits. *See* Defendants' Motion for Judgment on the AR, Exhibit 9 at 242.

This Court will consider the potential conflict of interest here in determining whether the plan administrator acted arbitrarily and capriciously. McShane, regardless of whether he was a fiduciary, played a large role in the benefits determination, in that he provided Dalton with the information that she was supposed to use to make a benefits determination and, as addressed above, did some interpreting of the plan. The company (which was also plan administrator) would certainly have a financial interest in not paying benefits in order to maximize revenue. It is unnecessary to define specifically how much weight is given to the potential conflict of interest, as it is not the decisive factor in the Court's determination that the denial of benefits was arbitrary and capricious.[17]

## B. Procedural Violations

Plaintiffs' procedural challenges are addressed in the first class issue. They

---

[17] In other words, even if this Court did not take conflict of interest into account here when reviewing Plaintiffs' claims under the arbitrary and capricious standard, this Court would still find, as will be discussed below, that the class members were wrongfully denied benefits.

assert that Defendants denied benefits to the class[18] in a manner that was procedurally defective. Their argument is that Defendants adopted a blanket policy to deny benefits. Plaintiffs allege that Defendants failed to conduct individualized assessments of HVAC associates. Rather, they made the decision prior to receiving any claims that they would deny Plaintiffs benefits and never made Plaintiffs aware of this fact.[19] This fits in with the type of procedural violations noted in *Moore*, supra, and *Wilkins*, supra.

This Court will now address Plaintiffs' procedural challenges to Defendants' conduct in denying them benefits under the three provisions of the Transition Pay Plan.

### 1. Earnings potential analysis

---

[18] Some class members who were denied benefits worked in the new position for SHIP. Prior to the integration with SHIP, there were almost 500 HVAC sales associates. After HVAC integrated with SHIP, 265 associates were no longer with the company as of June 24, 2005 (a retention rate of 47%) *See* Plaintiffs' Motion for Summary Judgment, Exhibit V at Sears/Allen 24532. By August of 2006, only 96 remained as sales associates. *Id.*, Exhibit W.

[19] In support of this assertion, Plaintiffs point, inter alia, to the June 3, 2005 appeal denial letter sent to Plaintiff HVAC associate Suzanne Novak. *See* Plaintiffs' Motion for Summary Judgment, Exhibit G. Novak had indicated to Dalton that nobody from Sears had advised her that she might be eligible for TPP benefits. Dalton responded in her denial letter, "That is because, based on the eligibility requirements for the Plan, the business determined that you were not eligible." *Id.*

Plaintiffs further note Dalton's testimony that the "business," SHIP, made an "initial judgment as to whether or not... any of the associates that were integrating... would meet the eligibility criteria of the plan." *See* Defendants' Motion for Judgment on the AR, Exhibit 9 at 40.

Defendants, as discussed above, view McShane's actions as mere assistance in a ministerial role, not the actions of a fiduciary.

After reviewing the entire record, including the arguments raised in the parties' detailed briefs and at oral argument, the Court finds that Plaintiffs have demonstrated that under the earnings methodology[20] used by Defendants, no HVAC associate could receive benefits, which substantiates Plaintiffs' claim of a predetermined plan of denial.

This finding is supported by Plaintiffs' witness, Dr. Paranjpe[21], in his expert report. Defendants moved to strike this report, but there is no basis for doing so. Although Defendants attack the report, the Court finds it noteworthy that Defendants did not offer their own expert to challenge Dr. Paranjpe's conclusions, leaving his determination undisputed by another expert. That conclusion was that after reviewing the methodology Defendants used, no person working more than 1321 hours[22] could become eligible for severance benefits. Although Roy Queen received benefits, Dr. Paranjpe found that Defendants did not include a 1% commission increase for him. However, he indicated that if he applied the math to Queen, giving him that 1% increase, he would not have qualified for benefits.[23]

---

[20] McShane provided an overview of the methodology in his deposition. *See* Defendant's Motion for Judgment on the AR, Exhibit 3 at 136.

[21] *See* Pages 8-10 of this opinion for a discussion of Dr. Paranjpe's report.

[22] An associate working 40 hours per week would easily exceed that number in about 34 weeks.

[23] As noted above, Defendants included as part of the earnings analysis a 1% increase in commission in 2005 for HVAC associates when they transferred to SHIP. *See* Defendants' Motion for Judgment on the AR, Exhibit 3 at 186.

*See* Defendants' Motion to Strike, Exhibit 2 at 55.

The utilization of this methodology was improper. Plaintiffs' allegation regarding Defendants' use of it constitutes a valid procedural challenge. Its use was certainly arbitrary and capricious. The employment of such a flawed methodology supports Plaintiffs' argument that there was a predetermined decision to deny benefits. Defendants either knew or should have known that under their methodology, class members would be unable to attain benefits.

Dalton looked to McShane for the earnings methodology to be established and for calculation of whether the differential was greater than 10%. Dalton did not, and could not, knowledgeably question the methodology or calculations used since she lacked a math degree. The earnings formula was established[24] and then all HVAC associates who applied, except Roy Queen, were denied benefits.

McShane admitted that he did not test to see if there was any variable amount that could hypothetically be placed in the analysis and result in a 10% or more decrease, nor was he aware of anyone doing so. *See* Defendants' Motion for

_____

[24] Although the focus of the parties' motions is on the use of this formula, McShane noted in his testimony that while the earnings potential methodology was predominantly used, two other models, the district level analysis and the high earners model, were utilized in response to specific assertions made by class members when they submitted their claims or appeals. *See* Defendants' Motion for Judgment on the AR, Exhibit 3 at 203-206. The district level analysis would look at other associates at the district level to see if they made similar earnings. *Id.*, Exhibit 3 at 203. The high earners model looked "at the close rates of what an average high performer has against the expected lead flow and the average ticket to forecast what the earnings would be for an individual with that type of performance." *Id.*, Exhibit 3 at 275. The use of either model did not lead to an order of benefits in any case.

Judgment on the AR, Exhibit 3 at 395. When asked if he tested any of the formulas used or the way in which he was analyzing the earnings, his response was, "We reviewed it with the plan administrator." *Id.*, Exhibit 3 at 405. Of course, Dalton had no mathematical background so that does not provide an adequate showing of validity of the method used. He went on to state that, "There's not a validity test, so to speak to— that would apply to this earnings methodology." *Id.*, Exhibit 3 at 405. When asked if he confirmed the reliability of the methodology used, McShane responded that the data in the computer was accurate. *Id.*, Exhibit 3 at 406-407. That of course says nothing about whether the methodology devised could ever result in an award of benefits.

Even in the case of Roy Queen, emails indicate, as noted above, that McShane deemed him an "anomaly" because he qualified for benefits. *See* Plaintiff's Motion for Summary Judgment, Exhibit N, Queen 0019. JoAnn Wrobel also stated that Queen was a "unique case in that when they run the regular formula, he is over 10%." *Id.*, Exhibit Q, Queen 0006. Using a different methodology (the district level analysis) for computing the earnings differential was then considered. Dalton responded that she did not think it was a good idea to use a different formula than the one applied to everyone else. *Id.*, Exhibit Q, Queen 0007. Dalton ultimately contacted Sears counsel, who advised her that it would be appropriate to continue utilizing the methodology they had been using.

*Id.*, Exhibit Q, Queen 0012. Queen was subsequently awarded benefits.

Moreover, the assumptions underlying the methodology for the earnings analysis frequently were drawn to the detriment of Plaintiffs' eligibility for benefits, including arbitrarily assuming that 2005 sales would be the same as 2004 and that commissions would increase 1% (without even accounting for what percentage of commissions earned in 2004 were earned on the first visit versus follow-ups, which were unlikely to happen now based on a one call close rule at SHIP[25]), while at the same time determining that the loss of business expense

---

[25] Although Defendants assert that there was no one call close rule, Joe Steenbecke, who was a vice president and general manger of SHIP, testified that if a SHIP associate did not make a sale on the first visit, the customer would likely be shifted to a different person. If a sale did not occur on the initial visit, then a different department would call the customers back after a period of time and if there was some interest, then a different sales representative would be sent. *See* Defendant's Motion for Judgment on the AR, Exhibit 6 at 86-87.

Defendants offer the testimony of McShane, who asserts that he is not aware of the one call close rule. *See* Defendants' Motion for Judgment on the Administrative Record, Exhibit 3 at 160. Defendants also point to several pages in the Administrative Record indicating that one sales representative had two sales appointments with one customer.

However, McShane's assertions and one instance of an employee (Stuart Garrett-who is not a class member) having two appointments with one customer do not minimize Steenbecke's testimony that the customer would likely be shifted to a different person if the associate did not close on the first visit or the assertions many of the class members made in their claims review letters (included in the administrative record) that such a rule existed. Furthermore, Dalton also gave testimony consistent with Steenbecke, stating, "And then in the SHIP world, I believe if you do not close a deal on the first call, your next lead [sic] be a different call. You wouldn't necessarily be assigned back to that person to do a follow-up. If the customer ended up calling and wanting a follow-up, it might be a different sales person responding to that call. So it was either go out and close the deal and if you don't do it then move on to your next lead." *See* Defendants' Motion for Judgment on the AR, Exhibit 9 at 157-158.

reimbursements would not constitute "earnings."[26]  McShane and Dalton both

testified that they did not consider in the earnings analysis whether cancellation

rates under SHIP were much greater than Sears.[27]  *See* Defendant's Motion for

Judgment on the AR, Exhibit 3 at 281; Exhibit 9 at 185.  Defendants also assumed

that the use of current benefit rate was the proper way to calculate the value of loss

of paid time off, but did not ever test whether use of the average of the four benefit

rates would have produced a different result.  They further failed to properly justify

not using actual paid time off earnings to estimate the value of the loss of paid time

off.  Again, this was another assumption made to the detriment of Plaintiffs.[28]

---

[26] McShane testified that SHIP did not offer reimbursement for mileage (except in California) or gas bills.  *See* Defendants' Motion for Judgment on the AR, Exhibit 3 at 175.  This is significant, for the loss of such reimbursement could be in Plaintiffs' view a loss of over $20,000, which largely exceeds the value of a 1% commission increase.  *See* Plaintiffs' Motion for Summary Judgment at 37.

Furthermore, McShane testified that the one percent commission increase would be included on the 2005 side of the earnings analysis "to provide an answer to some concern that was coming up regarding" the loss of business expense reimbursements (specifically mileage).  *See* Defendants' Motion For Judgment on the AR, Exhibit 3 at 186-187.  He went on to state, "The one percent was in relation to answer a question concerned around that [the loss of the expense reimbursement] and that's why it was provided."  *Id.*, Exhibit 3 at 187.  Despite this, the amount of this valuable source of income was not included in the earnings analysis as earnings for 2004.

[27] McShane also testified that he did not consider in the earnings analysis potential differences in the number of hours a SHIP employee would be expected to work versus how many hours an HVAC employee worked.  *See* Defendants' Motion for Judgment on the AR, Exhibit 3 at 289-292.

[28] Defendants argue that HVAC sales increased in 2005 after the HVAC SHIP integration and that therefore Dalton and McShane did not act arbitrarily in assuming as part of the methodology used that 2004 and 2005 sales would be the same.  *See* Defendants' Motion for Summary Judgment on the AR, Exhibit 5.  Defendants also maintain that HVAC sales associates would have the opportunity to sell SHIP products along with HVAC products, thus increasing

Moreover, these interpretations of the "earnings potential" provision were frequently initially not made by Dalton, but were made by McShane and others, although it was ultimately reviewed with Dalton. As noted above, McShane was not just providing numbers to Dalton as to whether someone's income would decrease more than 10%; he was actually interpreting the provision and determining what factors would be considered in the earnings potential analysis devised (For example, McShane testified that Dalton did not direct him to look at 2004 commissions and paid time off (PTO) as part of the earnings analysis but rather, that was something he determined himself would be appropriate). Since Dalton lacked a degree in mathematics and testified that she had no math modeling experience, it is unclear on what basis she could as plan administrator support her decision to sign off on decisions McShane (who was not given authority under the terms of the TPP to determine benefits) would make regarding the methodology used to compute eligibility for benefits.

ERISA requires an individualized assessment of an employee's claims, as well as notice if a determination is made that benefits are being denied. Here, the

_____

the opportunities to earn. However, as Plaintiffs note, McShane and Dalton did not know what sales would amount to when they were faced with the decision regarding benefits, so what ultimately occurred is irrelevant to the analysis. Furthermore, since so many HVAC sales associates left, Plaintiffs assert that the number of commissions for those who did stay would logically increase. Plaintiffs additionally argue that the numbers provided by SHIP are not reliable.

The parties also dispute whether bonuses, which were part of the earnings analysis, were consistently paid out in 2005.

plan administrator never informed class members that this formula that could never be satisfied was being utilized.

**2. Utilizing current skills provision**

The interpretation of the "utilizing current skills" provision in the TPP is also part of the procedural violation of a predetermined blanket policy of denial. Under the TPP, a new position is "comparable" to the prior position if it utilizes "current skills."

Under the arbitrary and capricious standard, the plan administrator's decision should be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *See Glenn v. Metropolitan Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd sub nom. Metropolitan Life Ins. Co v. Glenn*, 128 S.Ct. 2343 (2008) (*citing Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). While "that standard is deferential, it is not a rubber stamp for the administrator's determination." *See Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006).

A court, when interpreting an ERISA plan, will "apply federal common law rules of contract interpretation...." *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998). That means looking to the plain meaning of the words and "giv[ing] effect to the unambiguous terms of..." the plan. *Id.* at 556 (citation and

internal quotation marks omitted).

The words "utilizing current skills" as used in the Transition Pay Plan are ambiguous. The Plan does not define them. However, the words used are "*current skills*," not "*selling* skills."

Defendants' position is that since the SHIP position was one "utilizing current skills," the SHIP and Sears HVAC positions were comparable. Dalton testified that she made her decision that HVAC employees would be "utilizing current skills" at SHIP based on the fact that "they were outside sales people selling HVAC equipment and they were going to be outside sales people selling HVAC equipment going into customers home[s] the same as they had done before."[29] *See* Defendants' Motion for Judgment on the AR, Exhibit 9 at 173. Counsel for Defendants argue in their motion that Dalton "rationally concluded that HVAC sales associates who transitioned to SHIP would utilize their current skills because *both* outside sales positions were responsible for making in-home sales calls, selling the same HVAC products to the same residential customers in the same geographic area." *See* Defendants' Motion for Judgment on the AR at 63.

Plaintiffs assert that at Sears, HVAC associates followed the sale from beginning to end, taking part in every step of the process (what Plaintiffs call a

---

[29] Dalton went on to testify that "going from an outside sales job to an outside sales job even though the method by which you performed that job had differences along the way was, nevertheless, utilizing current skills." *See* Defendants' Motion for Judgment on the AR, Exhibit 9 at 176.

"horizontal sales model"). At SHIP, associates only were involved in the in-home sales call (a "vertical sales model"). Plaintiffs maintain that Dalton "did not consider differences in the business models" between the HVAC and SHIP positions and that "every skill demanded by the Sears HVAC job (marketing, logistics, development of customer relationship, working with and arranging for contractor installers, credit interface, oversight of work) except for those skills utilized in the actual sales call, were not utilized at SHIP." *See* Plaintiff's Motion for Summary Judgment at 8. Plaintiffs also assert that the HVAC sales position was split into two positions at SHIP- SHIP Sales Representatives and Project Coordinator. *See* Plaintiffs' Supplemental Brief [233], Exhibit J.

This Court finds that in interpreting the Plan, the plan administrator arbitrarily focused on "selling" in concluding that benefits could not be awarded under the skills provision. The plan administrator admitted as such in her deposition. The Plan could have included a definition for "utilizing current skills" that focused solely on "selling," but did not. The Plan also could have used the phrase "utilizing *sales* skills," but did not.

Dalton testified that she "made the determination that an associate going from an outside selling position to a outside selling position for purposes of the plan was utilizing current skills." *See* Defendants' Motion for Judgment on the AR, Exhibit 9 at 175. This conclusion is indicated in the claims denial letters sent

out to many of the class members who raised the argument that the SHIP position did not utilize current skills. Dalton often responded to claimants, "Offering an accounting job to a salesperson would be an example of a non-comparable job offer. Offering a sales job to a sales associate is a comparable job offer for Transition Pay Plan purposes."[30] Thus, Dalton found that Plaintiffs were not entitled to benefits because the two jobs both utilized "sales skills."

However, the TPP stated that Plaintiffs would not be entitled to benefits if the two jobs utilized "current skills."[31] She improperly and arbitrarily read the

---

[30] McShane's testimony is consistent with Dalton's interpretation. McShane testified that "[HVAC Associates'] responsibilities in SHIP were to concentrate and they were more narrowly focused on really what is their core function, which is to present product into– in customers' homes and sell product to customers as in-home sales representatives. And in the HVAC business, there were many other ancillary duties that included working with contractors, having to screen leads and turn them into appointments, having to follow up with customers, having to work with contractors, and manage that whole entire process, which all took away from the core and primary purpose of a sales representative, which is to sell." *See* Defendants' Motion for Judgment on the AR, Exhibit 3 at 469.

When asked what happened to those ancillary duties under SHIP, McShane replied, "They were handled by SHIP in its business model, those duties carried forward, but not at the burden of the HVAC sales associates and not at their expense. It was all handled through the SHIP business model so that they could concentrate purely on selling." *Id*. at 469-470. McShane thus acknowledged that these other duties (and, more importantly, the skills they entail) are not handled by the associates anymore.

[31] HVAC associates themselves viewed the SHIP positions as quite different from their prior jobs. *See* Plaintiff's Supplemental Brief [233] at 7-8.

For example, class member Allen stated in his claim, "While at Sears, I operated as if I were an independent business... scheduling my own appointments, providing the written estimate, procuring the contractor, obtaining credit approval... At SHIP, my role is limited to strictly selling– eliminating all but one of my current sales skills." *See* Plaintiff's Supplemental Brief [233], Exhibit B at GaryAllen 00001.

Class member DeRosa stated in his claim that at Sears, "I was allowed to schedule

word "sales" into the provision.  Moreover, interpreting the provision to mean that *denial* of benefits was appropriate under these circumstances was arbitrary and capricious, as her interpretation should have (as will be discussed below) lead her to conclude that an *award* of benefits was appropriate.

Furthermore, even if Dalton was correct in only focusing on "sales skills," she failed to give weight to the fact that with a one call close rule in effect, the skills needed to close that type of sale certainly differ from those needed for an associate to be more of a counselor and meet with the customer multiple times, build a relationship, and follow the sale from start to finish.[32]

In viewing the decision to interpret the provision in this manner in light of the procedural violation discussed above (the use of the rigged formula), it cannot be said that the decision was the result of a deliberate, principled reasoning process.  It is already known that a defective formula was used without the knowledge of class members.  That calls into question any further determinations

---

appointments at the customer's convenience and allow them time to make the right decision for them, not insist that they buy on the first visit.  I had latitude to select the best Sears-approved subcontractor for the job, not the one that Sears found the most economical.  This job requires a completely new skill set that demands that I close the sale on the first visit or forfeit the commission.  This was not what I was trained for."  *See* Plaintiff's Supplemental Brief [233], Exhibit B at DennisDerosa 00093.

[32] McShane himself was aware of the differences regarding HVAC and SHIP "sales," testifying, "There is no dispute that their sales model is different."  *See* Defendants' Motion for Judgment on the AR, Exhibit 3 at 284.  However, he went on to state, "That's not what's at relevance here.  What's at relevance is that they're selling the same product to the same customer base."  *Id.*

the plan administrator made.  The interpretation of the skills provision in this way

fits in with Plaintiffs' assertion of the existence of a predetermined policy of

denial.

### 3. The commuting provision

The last provision of the TPP to discuss is the commuting provision.  As

part of their procedural challenge, Plaintiffs argue that the plan administrator

improperly interpreted the "reasonable commuting distance" provision of the TPP

in such a way to ensure that Plaintiffs could never be eligible for benefits

(consistent with a predetermined policy of denial).

In order for the new SHIP position to be comparable, the Plan originally

stated that it had to be "within a reasonable commuting distance (approximately 30

miles) of the closed or reorganized unit."  *See* Plaintiff's Motion for Summary

Judgment, Exhibit B at Sears 00027.  When the TPP was amended, the commuting

provision was modified.  In order for a job to be considered comparable, it had to

be "within a reasonable commuting distance (approximately 30 miles if the

commute is daily or the equivalent if less frequently than daily – e.g., 150 miles if

the commute is weekly or 300 miles if the commute is every two weeks) of the

associate's home."  *Id*., Exhibit B at Sears 00042.  Defendants acknowledge that

unlike Sears, SHIP required sales associates to physically report to a district office.

*See* Defendant's Motion for Judgment on the AR at 65.

Just as the Plan did not define "utilizing current skills," it also did not define the term "distance."  Therefore, it was left to the plan administrator, Dalton, to interpret what that term meant.  Dalton ultimately concluded that "reasonable commuting distance" meant one-way, not round trip.

Plaintiffs argue that Dalton arbitrarily interpreted the provision to mean one-way and interpreted the provision in such a way that Plaintiffs could never satisfy the provision.  Plaintiffs assert that class members were given different answers about how many times per week they would be required to commute.  Despite the fact that they were doing the same job, some people were told to come in more often, depending on how far away they lived.  Plaintiffs assert that Defendants' goal was to always keep Plaintiffs within the distance requirement so that they could never exceed it and become eligible for benefits.

Defendants assert that Dalton's interpretation of the provision to mean "one-way" was rational and should be upheld.

The Court finds that Dalton's interpretation of this provision fits in with the overall procedural challenge alleged.  As discussed above, Plaintiffs could never satisfy the earnings provision for terms of determining a comparable job, nor could they satisfy the skills provision.  Defendants' interpretation of the commuting provision is consistent with that blanket policy of denial.

Moreover, Defendants' interpretation of how often a person must commute

into the office essentially reads the commuting provision out of the policy. As McShane testified, the frequency of the number of times an associate would be required to come in was based upon how far they lived from the office; when asked how that provision would ever allow for a trigger of eligibility for benefits, McShane responded, "I don't know." *See* Defendants' Motion for Judgment on the AR, Exhibit 3 at 109. McShane also was "not aware of an instance" or "even a hypothetical instance" where a person could have fallen outside the guidelines and become eligible for benefits. *Id*., Exhibit 3 at 118-119. The commuting provision cannot be interpreted in such a way that it is read out of the policy because nobody could ever satisfy it. There would be no need for the Plan to include such language in the first place if the provision could never be satisfied. Individual class members also assert that they were told by managers that they were required to report multiple times per week, which would have triggered eligibility, but the plan administrator refused to credit those arguments and would tell them that their normal commute was within the guidelines.

### C. Remedy

 The Court therefore finds on the first class issue that Defendants wrongfully denied benefits to the class in a manner that was procedurally defective.

The remaining issue is addressed in the second class issue: Whether benefits are due to the class under the terms of the TPP. The question this Court is faced

with is whether to remand this case or to order benefits across the class.

Defendants are correct that typically, if there is a finding of a procedural violation, the case is remanded to the plan administrator to make a new determination of benefits based on a correction of the procedural defect. It is only when there is an issue with the substantive interpretation of a provision (the plan administrator interpreted a provision in a manner that was arbitrary and capricious) that a court can order that benefits be provided rather than remanding.

The Sixth Circuit, in *Shelby*, supra, and *Elliott*, supra, has addressed how to determine whether to remand upon a finding that benefits were wrongfully denied. In *Shelby*, the Court stated:

> In *Elliott*, this Court set forth the principles relevant to the selection of a remedy for a plan administrator's erroneous denial of benefits. The court in *Elliott* explained that where the problem is with the integrity of [the plan's] decision making process, rather than that a [claimant] was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator...
>
> Remand therefore is appropriate in a variety of circumstances, particularly where the plan administrator's decision suffers from a procedural defect or the administrative record is factually incomplete. For example, where the plan administrator fails to comply with ERISA's appeal-notice requirements in adjudicating a participant's claim, the proper remedy is to remand the case to the plan administrator so that a full and fair review can be accomplished. Courts adopting this position have reasoned that a procedural violation does not warrant the substantive remedy of awarding benefits. Remand also is appropriate where the plan administrator merely fail[ed]... to explain adequately the grounds of [its] decision. In addition to procedural irregularities, an incomplete factual record provides a basis to remand the case to the plan administrator...

> In contrast, where there [was] no evidence in the record to support a termination or denial of benefits, an award of benefits is appropriate without remand to the plan administrator.... Thus, where a plan administrator properly construes the plan documents but arrives at the wrong conclusion that is simply contrary to the facts, a court should award benefits. Under such circumstances, remand is not justified to give the plan administrator a second bite at the apple.

*See Shelby*, 581 F.3d at 373-374 (citations and internal quotation marks omitted).

Here, this Court has found that Defendants wrongfully denied benefits to the class in a procedurally defective manner (the use of the rigged formula and, consistent with that, interpretations of the Plan provisions in such a way that Plaintiffs could never qualify for benefits), suggesting that remand might be appropriate.[33]

However, included within that finding is the finding that the plan administrator's substantive interpretation of the "current skills" provision was arbitrary and capricious. The plan administrator, as she testified to and indicated in her letters to claimants, made a determination regarding the "utilizing current skills" provision— She asserted that the SHIP job did in fact utilize the skill of selling, just like the HVAC job, and therefore, Plaintiffs could not get benefits under this provision.

---

[33] Hypothetically, if this Court were to follow Defendants' suggestion and remand, the plan administrator would have to be ordered to utilize an earnings differential formula that was not rigged, interpret the commuting provision in such a way that the provision would not be read out of the formula, and interpret the skills provision in a manner that was not arbitrary and capricious.

This Court can accept the plan administrator's testimony— What these two jobs have in common are that they both involve sales. Where the Court diverges with the plan administrator is that she said this means benefits should not be ordered. This Court disagrees. The Plan provision says "utilizing current skills." If the provision said "utilizing sales skills," then the plan administrator might be right. But the TPP does not say that. Dalton arbitrarily read the word "sales" into the provision and denied benefits.

The Court finds that her conclusion, that the only thing these jobs have common is sales, equals benefits, since the new job had to utilize "current skills." A remand is inappropriate. Upon remand, the plan administrator cannot be offered the chance to now offer new reasons why the jobs are actually comparable. Dalton cannot now state, "Not only does the new job utilize skills related to the sales call, but it also utilizes other skills as well." The plan administrator already reviewed the Sears HVAC and SHIP positions and what they entail and concluded that what they have in common is sales and therefore benefits were not to be awarded. That interpretation was applied across the class and used to deny benefits when it should have actually led to the granting of benefits since the new job had to utilize "current skills," not "sales skills." That denial was consistent with the use of an earnings methodology under which benefits could never be obtained. Moreover, that denial was arbitrary and capricious and this Court believes it warrants an order

of benefits under *Elliott* and *Shelby*.

Furthermore, even if it was proper to focus only on "sales skills," the plan administrator failed to give weight to the fact that with a one call close rule in effect, the skills needed to close that type of sale on the first shot certainly differ from those needed for an associate to be more of a counselor and meet with the customer multiple times, build a relationship, and follow the sale from start to finish. That means that even the sales skills involved in the two positions were different. Either way, whether the plan administrator improperly read the word "sales" into the Plan and ignored other skills or properly read "sales" into the language but failed to give weight to the fact that the sales skills actually differed, an award of benefits across the class is appropriate.[34]

Under the second class issue, benefits are thus due to the class under the terms of the Transition Pay Plan.[35] Defendants are ordered to provide benefits to

---

[34] Although not all class members raised the skills argument in their claims letters (some only argued they were entitled to benefits based on the earnings differential and/or commuting provision), it would have been futile to have raised the skills argument because the plan administrator repeatedly rejected the argument (to those class members that raised it) that the skills utilized were not the same. There is no indication that she would have interpreted the "skills" provision in any way other than the way she consistently interpreted it when class members raised the issue. That way was with the frequent response that "offering an accounting job to a salesperson would be an example of a non-comparable job offer. Offering a sales job to a sales associate is a comparable job offer for Transition Pay Plan purposes." Moreover, the plan administrator's interpretation of the provision is consistent with the overall theory of a blanket policy of denial.

[35] Any additional arguments raised by Plaintiffs need not be addressed, as this Court is ordering that they are entitled to benefits based on the above grounds.

the class members.[36]

## VI. Conclusion

Based on the above findings, **IT IS HEREBY ORDERED** that

Plaintiffs' Motion for Summary Judgment [71] is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary

Judgment under Rule 56 [331] is **GRANTED IN PART AND DENIED IN**

**PART**, Defendants' Motion to Strike [335] is **GRANTED**, and Defendants'

Emergency Motion to Bifurcate [230], Motion to Dismiss [330], Motion for

Judgment on the Administrative Record [333], and Motion to Strike Reports [351]

are **DENIED.**

**SO ORDERED**.


S/ARTHUR J. TARNOW
Arthur J. Tarnow
Senior United States District Judge

Dated: May 27, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of
record on May 27, 2010, by electronic and/or ordinary mail.

S/LISA M. WARE
Case Manager

---

[36] The parties have not yet reached agreement on the amount of benefits, taking into
account the value of various milestones reached, due to the class.

**Index**

I.     Defendants' Emergency Motion to Bifurcate [230] . . . . . . . . .     3

II.    Defendants' Motion to Dismiss, or in the alternative, to
remand the claims of class members Bruno Vecchiarelli,
Gil Yaras, Daryl Geiger, and Edwin Goldberg to the Plan
Administrator [330] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3

III.    Defendants' Motion for Summary Judgment [331] . . . . . . . .     4

IV.    Defendants' Motion to Strike [351] . . . . . . . . . . . . . . . . . . . .     6

    A.     Dr. Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7

    B.     Dr. Paranjpe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

V.    Defendants' Motion for Judgment on the Administrative Record
[333] and Plaintiffs' Motion for Summary Judgment [71] . . . .     10

    A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

    B.     Procedural Violations . . . . . . . . . . . . . . . . . . . . . . . . . . .     20

        1.     Earnings potential analysis . . . . . . . . . . . . . . . . . . .     21

        2.     Utilizing current skills . . . . . . . . . . . . . . . . . . . . . . .     27

        3.     The commuting provision . . . . . . . . . . . . . . . . . . . .     32

    C.     Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

VI.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     39